Jeffrey S. Simpkins, WV State Bar
Number 9806
  *simpkinslawoffice@gmail.com*
SIMPKINS LAW
102 E. 2nd Ave.
Williamson, West Virginia 25661
Telephone:      (304) 235-2735

Eric P. Early, CA State Bar Number
166275,
*(pro hac vice forthcoming)*
  *eearly@earlysullivan.com*
Jeremy Gray, CA State Bar Number
150075,
*(pro hac vice forthcoming)*
  *jgray@earlysullivan.com*
Kevin S. Sinclair, CA State Bar Number
254069,
*(pro hac vice forthcoming)*
  *ksinclair@earlysullivan.com*
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone:   (323) 301-4660
Facsimile:   (323) 301-4676

Attorneys for
PLAINTIFF DON BLANKENSHIP

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

| | |
|---|---|
| DON BLANKENSHIP,<br><br>                   Plaintiffs,<br><br>vs.<br><br>NBCUNIVERSAL, LLC; CNBC, LLC.; and DOES 1-50 inclusive,<br><br>                  Defendants. | Case No.:  2:20-cv-00278 |

## COMPLAINT

## INTRODUCTION

## A Case of "Weaponized Defamation"

1.      The mainstream media and much of the political establishment today routinely, and with actual malice, sets out to destroy public figures with outright lies. The competition for viewers is intense and nothing brings in eyeballs like scandal and degradation.  So too is the establishment media's bloodthirsty desire to destroy those with whom they disagree politically. We live in an age of weaponized defamation where lies can be repeated in more ways at more times in more places with more speed than anyone could possibly have imagined even five years ago, much less in 1964 when the seminal case in the area of defamation of public figures was decided. This lawsuit will help determine whether the media and the political establishment, in this increasingly malevolent and digitized environment, can continue to tell outright lies about what they consider public figures running for office, as part of their effort to sway elections and tarnish non-establishment candidates, while intentionally putting blinders on, and completely hoodwinking, the American public in the process.

2.      In the 2018 election cycle, plaintiff Don Blankenship (sometimes referred to herein as "Plaintiff") was one of several Republican candidates vying to be the next United States Senator from West Virginia.  Mr. Blankenship personified and epitomized what it is to be a non-establishment candidate for office.  As such, the DC establishment "swamp" and the establishment media united against Mr. Blankenship.  The entire establishment media spectrum – from conservative to liberal, from fringe social media to mainstream media – commenced a search and destroy mission to take out Mr. Blankenship.

3.      Prominent mainstream beltway "swamp" Republicans, led by Senate Majority Leader Mitch McConnell, told all who would listen that Mr. Blankenship had to be stopped at all costs.

263663

4.      McConnell set in motion the wheels of a clandestine campaign – including a "menu of items" -- to destroy Mr. Blankenship and blatantly interfere in a federal election, using among other things, the National Republican Senatorial Committee ("NRSC"), and his contacts in the establishment media, including Fox News in particular, to do McConnell's (and in turn, the NRSC's) bidding.

5.      Not to be outdone, the establishment left-wing media, including its leading mouthpieces CNN, MSNBC and The Washington Post, joined in the defamation chorus. They too set out to destroy Mr. Blankenship, and to subvert an election, but for their own particular reasons -- doing so would protect their incumbent Senator of choice, Democrat Joe Manchin (who had been beaten in the past in both legal and political battles with Mr. Blankenship) -- and also fit perfectly within the leftwing media's tried and true agenda of using certain prominent conservatives as poster boys to paint a false picture of purported conservative evil and depravity across the board.

6.      This toxic environment provided the venue in which multiple news persons disregarded their obligation to report the truth and lied about Mr. Blankenship, reporting *ad nauseum* in the days leading up to the May 8, 2018 West Virginia Primary, that he was a "convicted felon" or had been "imprisoned for manslaughter." Mr. Blankenship is well-acquainted with the rough and tumble of politics. This is not that. Mr. Blankenship ***is not and never was a felon*** and has never been convicted of a felony, neither manslaughter nor any other. These false claims were not simple insults, but rather were part of a concerted plot by the establishment media and the political establishment to destroy Mr. Blankenship personally and interfere in a federal election.

/ / /

/ / /

/ / /

COMPLAINT

263663

## Brief Background Leading to the Weaponized Defamation
## of Don Blankenship

7.      Mr. Blankenship was raised in the small West Virginia town of Delorme. He began in the mines, working his way through school as a coal miner.  Following graduation, he rose in the coal business from an accounting job to becoming CEO of Massey Energy in 1992.  He worked in the business for thirty-eight years.  Under his leadership, Massey Energy grew from a small outfit into the largest coal producer in Central Appalachia, which employed thousands of miners, and provided energy to millions of consumers.  Mr. Blankenship's leadership helped destroy the coal miner's union, which resulted in the creation of thousands of new jobs and earned Mr. Blankenship the permanent enmity of union boss and Obama minion Richard Trumka.

8.      On April 5, 2010, a tragic explosion at Massey's Upper Big Branch Mine took the lives of twenty-nine miners.  The explosion occurred *just a few hours after* ventilation changes required by the Obama Administration were completed, which cut the mine's airflow in half.  President Obama immediately sought to divert blame from his Administration's culpability, and to continue to curry favor with union boss Trumka (who had visited Obama in the White House more than any other person).  Obama purported to show sympathy for the miners' families by holding a press conference only ten days after the explosion -- long before anyone even was able to enter the mine to investigate -- in which the President told the world the explosion was the fault of Massey's management – *i.e.* Don Blankenship.  In fact, a scientific analysis of the explosion itself has ultimately shown that the detonation was caused by ill-advised and ill-conceived ventilation regulations imposed by the Obama Administration's Mine Safety and Health Administration (MSHA) which were completed just hours before the tragedy.

263663

9.      The Obama Justice Department ("DOJ") followed with a politically supercharged and motivated indictment against Mr. Blankenship accusing him of three separate felonies and a misdemeanor.  The Obama Administration detested Don Blankenship.  Mr. Blankenship had long been well-known as the most prolific provider and defender of coal miners' jobs in West Virginia.  He had also almost singlehandedly revived the conservative brand and the Republican party in West Virginia and had long been a vocal critic of Obama.  He was therefore an easy mark for the coal-hating Obama Administration and a target of its unrelenting war on coal.

10.      The aggressive federal prosecution went to trial in October 2015, and Mr. Blankenship *was found innocent by a West Virginia jury on all felony counts*.  He was convicted, however, only *of a misdemeanor*.  *Notably, at that time, many media outlets accurately reported that Mr. Blankenship was convicted only of a misdemeanor and not for any of the felony counts he was facing.*

11.      A first-time misdemeanant is never (or virtually never) sent to prison, but thanks to the overarching and outrageous pressures brought to bear against him by the government, Mr. Blankenship was sent to prison by the Obama DOJ for one year (the maximum for which any misdemeanant can be sentenced) and served time in prison.  Mr. Blankenship may have been the only prisoner in any federal prison who had been convicted of just a misdemeanor.

12.      The Department of Justice Office of Professional Responsibility has since investigated the conduct of the United States Attorneys who prosecuted Mr. Blankenship -- Booth Goodwin and Steve Ruby.  The OPR found that massive prosecutorial misconduct had occurred in the prosecution of Mr. Blankenship, stating among other things that, "because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct."

## The West Virginia Republican Primary

13.     In 2017, Mr. Blankenship announced his plans to run for the West Virginia Senate seat held by Democrat Joe Manchin. The May 8, 2018 Republican Primary pitted Mr. Blankenship against West Virginia Congressman Evan Jenkins and Attorney General Patrick Morrisey.  Thanks to Mr. Blankenship's longstanding prominence in West Virginia, the significant financial resources he brought to bear, his effective ads and success in debates, by early May 2018, his opponents' internal polls showed Mr. Blankenship had moved into contention.

14.     The potential election of Mr. Blankenship was an anathema to Mitch McConnell and the GOP Establishment.  As Mr. Blankenship rose in the polls, Leader McConnell and his colleagues determined that they would do whatever they could, including lying and smearing to stop Mr. Blankenship from winning the primary.  At or about this time, it was widely reported that McConnell convened clandestine meetings of the NRSC to formulate a plan, including a "menu" of options, to stop Mr. Blankenship from winning the Primary.  Some of these meetings took place in McConnell's office in the Capitol.  One attendee, Senator John Thune, the third-ranking member of the Senate leadership, was quoted as "hop[ing] and pray[ing]" that Blankenship would not win the nomination.

## The Defamatory Attacks

15.     What followed next was Mr. Blankenship's conviction by the media not once, but dozens of times, of being a "felon."

16.     The desire to stop Mr. Blankenship began to be given voice on April 25, 2018, when Judge Andrew Napolitano appeared on the Fox News Channel program "Outnumbered" and falsely claimed that Mr. Blankenship "went to jail for manslaughter, after being indicted."

17.     The defamatory attacks on Mr. Blankenship escalated after he walloped his opponents in a nationally televised May 1, 2018 Fox News Debate, which took

**COMPLAINT**

place just a week before the Primary.   Polling by Mr. Blankenship's opponents estimated his performance gained him an eight-point lead in the race.

18.    Over the ensuing week, multiple news personalities, lubricated by their disdain for Mr. Blankenship, and some at the direction of McConnell and other GOP leaders, repeatedly and falsely called Mr. Blankenship a "felon" and "convicted felon". These defamatory statements were made on Fox News and in other venues by conservative commentators.

19.    In addition, Mr. Blankenship was repeatedly defamed by the left-leaning mainstream media, including CNN and MSNBC.   Examples include MSNBC's Chris Hayes calling Mr. Blankenship a "felon" on MSNBC at least twice and Joy Reid calling him a "convicted felon" on May 5, 2018.  Others did the same.

20.    Moreover, many of the defamatory statements were made in conjunction with reference to the mine disaster and thus, had the additional effect, through inference, implication, *innuendo* and/or insinuation, of further defaming Mr. Blankenship by falsely attributing to him responsibility for murder.

21.    The evidence in this case will prove the Defendants acted with actual malice and reckless disregard for the truth.  As a result, Mr. Blankenship has suffered enormous damages.  Mr. Blankenship possesses a proven record of adding billions of dollars in value to an enterprise.   As Massey's CEO, Mr. Blankenship grew the company from a valuation of $150 million to $7.8 billion (while most others in the marketplace were failing).  The defamation of Mr. Blankenship as a "felon" and a person sent to prison "for manslaughter" has so smeared his reputation that he has been prevented from pursuing other businesses and opportunities and generating similar returns of billions of dollars.  Because of this harm and a variety other injuries Mr. Blankenship has suffered, he seeks damages in an amount not less than $2 billion dollars.

22.     In addition, Mr. Blankenship seeks substantial punitive damages in the amount of $10 billion dollars.  The purpose of punitive damages is to punish a defendant for outrageous conduct and/or to reform or deter the defendant and others from engaging in conduct similar to that which formed the basis of the lawsuit.  The defendants in this case are massive media companies, and a large punitive damage award is necessary to adequately punish and/or deter these Defendants from repeating this conduct.

## JURISDICTION AND VENUE

23.     The United States District Court for the Southern District of West Virginia has original jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

24.     Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391 because, among other reasons and without limitation, a substantial part of the events or omissions giving rise to the claims occurred in this district.

25.     The defendants in this action were originally named in the matter styled *Don Blankenship v. Andrew Napolitano, et. al* (Civil Action No. 2:19-cv-00236) and were dismissed by order of Judge John T. Copenhaver.  *See* Case 2:19-cv-00236 Document 398 at 48-50.  Service of the present complaint is made pursuant to West Virginia Code section 55-2-18(a)(1) and (b)(3).  This statute is "a highly remedial statute that should be liberally construed to allow a party who has filed a timely action to have their case decided on the merits."  *Employers Fire Ins. Co. v. Biser*, 161 W.Va. 493, 242 S.E. 2d 708 (1978).

## PARTIES

26.     Plaintiff Don Blankenship is an individual and a citizen of the State of Nevada who resides in West Virginia and was in 2018 a candidate for the United States Senate from West Virginia.

27.     As to Defendant NBCUniversal, LLC ("NBCUniversal"), Plaintiff is informed and believes, and based thereon alleges, that NBCUniversal is a Delaware limited liability company whose principal place of business is in New York, New York.   NBCUniversal is an international media conglomerate with numerous holdings in the news field, including NBC News, CNBC, and MSNBC. NBCUniversal is also the owner of the websites that publish articles under those names.

28.     As to Defendant CNBC, LLC ("CNBC"), Plaintiff is informed and believes, and based thereon alleges, that CNBC is a New Jersey limited liability company.   CNBC is an American pay television business news channel that is owned by NBCUniversal, which is a subsidiary of Comcast Corporation, a national telecommunications and mass-media conglomerate.

29.     Defendants CNBC and NBCUniversal share the same counsel with MSNBC Cable LLC ("MSNBC") which remains a party to the *Napolitano* matter. CNBC and NBCUniversal had both actual and constructive notice that they were named as defendants prior to the date on which they filed their Motions to Dismiss (August 16, 2019).   Plaintiff's failure to serve CNBC and NBCUniversal was inadvertent and remedied immediately upon discovery.   Plaintiff acted in good faith and with diligence under the circumstances.

30.     Plaintiff does not know the true names and capacities of the Defendants sued in this Complaint as Does 1 through 25, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of those Doe Defendants when the same are ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of these fictitiously named Defendants was involved in the defamatory "push poll" conducted prior to the West Virginia Primary, as further set forth below.

31.     Plaintiff does not know the true names and capacities of the Defendants sued in this Complaint as Does 26 through 50, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of those Doe Defendants when the same are ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint, as further set forth herein, and that Plaintiff's damages, as alleged in this Complaint, were proximately caused by these Defendants' conduct.

## GENERAL ALLEGATIONS

### Background

32.     Plaintiff Don Blankenship was born into a poor family in Appalachia, one of four children in a single-parent home.  Mr. Blankenship's first job was as a worker at his mother's small gasoline filling station, which also served as the family's home.  Mr. Blankenship graduated from high school in 1968 and earned a degree in accounting from Marshall University in Huntington, West Virginia in 1972, spending his summers working in the West Virginia coal mines.

33.     Mr. Blankenship worked for ten years in the food business, until he was offered an accounting job with Massey Energy Company in 1982, then a mining concern partly owned by Royal Dutch Shell.  Mr. Blankenship climbed the ranks, and in 1992, became president and CEO of Massey Energy, its first chief executive outside the Massey family.  With Mr. Blankenship at the helm, Massey Energy grew from a family-run outfit into the largest coal producer in West Virginia with billions of dollars in annual revenue.

### The Upper Big Branch Explosion

34.     On April 5, 2010, tragedy struck Raleigh County at the Upper Big Branch Mine.  Flammable gas deep in the mine ignited, causing an explosion which took the lives of twenty-nine miners.

35.     President Obama and others in his administration immediately claimed that the managers of the Upper Big Branch Mine – *i.e.* Mr. Blankenship – were responsible for the explosion.  Just ten days after the accident, President Obama attributed the accident to "a failure first and foremost of management." However, owing to large concentrations of toxic gas, no one accessed the mine to determine the explosion's cause until ***long after*** the President had pointed the finger of blame.

36.     The Federal Government's investigation into the explosion was conducted by the Mining Safety and Health Administration (MSHA).  However, any conclusions reached by MSHA were inherently suspect because it was necessarily investigating itself.  In the months leading up to the accident, MSHA had required Massey to implement a new ventilation system at the Upper Branch Mine. Airflow into a mine is measured in "cubic feet per minute" (CFM).  At about the time of the accident, the law required that airflow be measured in the mine at 30,000 CFM. Prior to MSHA requiring ventilation changes, the Upper Branch Mine was measured at four times the legal requirement: 120,000 CFM.  After the MSHA ventilation changes were implemented, the CFM dropped to 50,000 CFM.  Thus, the changes required by MSHA cut the mine's airflow by sixty-percent.

37.     Eight months after the disaster, on December 6, 2010, MSHA concluded that a coal bed methane build-up ignited and created an explosion.  According to MSHA, the ventilation deficiencies in the mine – ***which it had caused*** – were a critical factor in causing the explosion.  Nonetheless, MSHA placed the blame on Massey and Mr. Blankenship.

38.     In April 2014, Mr. Blankenship released a documentary which refuted the MSHA's findings and challenged the inherent conflict of having a regulatory agency investigate an explosion where it was likely at fault.  Among other things, the documentary identified powerful scientific evidence, which refuted MSHA's

conclusion that the explosion was caused by an influx of methane. An analysis of the air vented from the mine at the time of the explosion revealed that the explosion almost certainly resulted from a very rare inundation of natural gas through a crack in the mine's floor, which gas would have been swept out of the mine by a stronger airflow, but for MSHA's required pre-explosion ventilation changes.

39.     The Obama Administration was irate over the documentary and almost immediately began a renewed investigation of Mr. Blankenship, following Senator Manchin's demand that Mr. Blankenship be indicted. Seven months after the documentary was released, on or about November 13, 2014, federal prosecutors from the Obama Administration charged Mr. Blankenship with three felonies, including conspiracy to defraud the Federal mine regulators. He was also charged with a misdemeanor, conspiring to violate mine safety laws.

40.     The Federal Government brought the full weight of its infinite resources to bear on Mr. Blankenship. The matter went to trial in October 2015 and lasted about two months.

41.     Following lengthy deliberations, the West Virginia jury found Mr. Blankenship innocent on *all* felony charges on December 3, 2015. The jury convicted him of the misdemeanor offense.

42.     On April 6, 2016, the Judge sentenced Mr. Blankenship to one year in prison. The Judge refused to stay Mr. Blankenship's sentence pending his appeal, and he served one year at Taft Prison in Kern County, California.

43.     Mr. Blankenship was released from custody in the Spring of 2017.

### Mr. Blankenship Runs For Senate

44.     In January 2018, Mr. Blankenship formally announced his plans to run as a Republican for the U.S. Senate seat held by Senator Joe Manchin, a Democrat. The Republican primary was scheduled for May 8, 2018. In light of the then-recent events, Mr. Blankenship's candidacy was viewed as a long-shot.

45.     The fight for the Republican nomination was joined in earnest in January 2018.  The race ultimately pitted Mr. Blankenship against West Virginia Congressman Evan Jenkins and Attorney General Patrick Morrisey.

46.     Mr. Blankenship outperformed expectations in the primary campaign. He campaigned well, expended significant resources in support of his campaign, and produced effective campaign ads.

47.     About a month before the May 8, 2018 primary, based on internal polling, it became clear to Senate Majority Leader McConnell, the NRSC, and others in the GOP Establishment, as well as many in the mainstream media, that Mr. Blankenship had drawn even in the race with the other two contenders.  Plaintiff is informed and believes that in the weeks before the May 8th Primary, several meetings occurred, attended by Leader McConnell, members of the NRSC, and others, in which a "menu" describing possible ways to defeat Mr. Blankenship was discussed. Some of these meetings may have occurred in Federal Government offices in violation of Federal Campaign finance laws.  At these meetings, the attendees determined and agreed that Mr. Blankenship's candidacy must be stopped at all costs, including by smearing Mr. Blankenship in the media with false stories.  At the end of April 2018, Leader McConnell expressed his disdain for Mr. Blankenship this way: "I hope we actually nominate someone who can actually win the election."

### A Scheme Is Implemented to Defeat Mr. Blankenship

48.     On or about March 25, 2018, persons unknown (sued here under the fictitious names of Does 1-50) created and carried out a "push poll" wherein phone operators would call potential voters in West Virginia purporting to conduct political polling and asking the voters questions predicated on the idea that Mr. Blankenship was a "felon."   Rather than simply to collect information to assist with the defamation campaign against Mr. Blankenship, the "push poll" also was intended to defame Mr. Blankenship and derail his campaign by planting the false idea in the

263663

mind of the voters "polled" that Mr. Blankenship was a felon and/or had been convicted of a felony. Plaintiff intends to amend this Complaint once the identities of the persons or entities responsible for this defamatory "push polling" is ascertained.

49.     On March 30, 2018, the Democratic Senatorial Campaign Committee published an article which stated: "Republicans are increasingly worried that former coal CEO and ex-felon Don Blankenship could come out on top in the primary, easing Senator Manchin's path to reelection in the fall".

50.     On April 10, 2018, the political action committee ostensibly supporting Mr. Morrisey's campaign – 35th PAC – responded to a tweet by Mr. Blankenship, with the following defamatory tweet: "You are also a convicted *felon* hurting West Virginia families." Mr. Blankenship communicated directly with the major funders of this PAC and advised that this tweet was false. No correction was ever issued. At the time this tweet was issued, the authors (and likely the PAC's top donors as well) knew that it was false, but nonetheless proceeded to publish because of their malice toward Mr. Blankenship.

51.     Over the ensuing days, multiple similar defamatory statements were made about Mr. Blankenship in print, on broadcast media, via social media platforms, and elsewhere.

### Mr. Blankenship Crushes His Opponents In The May 1st Nationally-Televised Fox Debate Causing The Smears To Escalate

52.     On May 1, 2018, one week before the primary election, Mr. Blankenship participated in a debate with the other two Primary candidates which was televised nationally on the Fox News Channel. The national broadcast, hosted by Fox News stars Bret Baier and Martha MacCallum, resulted from the intense national interest in the West Virginia primary in political circles, because of concerns about Mr. Blankenship, and a by-then-widespread belief that the Republican primary winner

could defeat Democrat Joe Manchin in the general election because of the state's massive support for President Trump in 2016.  Mr. Blankenship addressed his conviction and imprisonment right out of the gate, stating in no uncertain terms: "I faced thirty years in prison for a fake charge, and I beat all three of the felonies. … It's incredible, they sent me to prison for a misdemeanor.  I was the only prisoner there that was a misdemeanant."  Most objective observers concluded that he won the debate handily and, by some estimates, gained eight points against his opponents.

53.     Thereafter, multiple statements were made, by a variety of entities and individuals, in print, on broadcast media, on social media platforms, and elsewhere, that Mr. Blankenship was a "felon" a "convicted felon" and variations of those statements.  In addition, many of these statements were made in such a way or context that they either directly asserted that Mr. Blankenship had been found guilty of charges relating to the accident at the Upper Big Branch Mine or made such a claim via innuendo or implication.  All of these statements were false and made with actual malice and are the subject of the following lawsuits:  *Don Blankenship v. Andrew Napolitano, et. al* (Case No. 2:19-cv-00236); *Don Blankenship v. Donald Trump, Jr.* (Case No. 2:19-cv-00549); *Don Blankenship v. Boston Globe Media Partners, LLC* (Case No. 2:19-cv-00589).

54.     Mr. Blankenship lost his bid to be the GOP nominee on May 8, 2018.  In addition to the injuries to Mr. Blankenship's reputation and other harm visited upon him by the defamatory statements alleged above, these unlawful statements were also a material cause of his loss in the Primary.

### The Defendants Smeared Plaintiff Even After The Election

55.     On May 17, 2018, Leigh Ann Caldwell, writing for Defendant NBCUniversal's NBCNews.com website, described Mr. Blankenship as an "ex-coal baron and ***convicted felon***."  Ms. Caldwell and NBCUniversal knew this claim was

false because, among other reasons and without limitation, NBC News reported on April 6, 2016 that Mr. Blankenship had only been convicted of a misdemeanor. Moreover, Mr. Blankenship's conviction was a matter of public record which was readily available to Ms. Caldwell. Ms. Caldwell is a sophisticated and knowledgeable political journalist with extensive experience and involvement in politics. Plaintiff is informed and believes that NBCUniversal has adopted and enforces ethical and other standards which govern its reporting and publication of information and in particular information about a person's criminal history. Plaintiff is further informed and believes that these standards were applicable to Ms. Caldwell at the time she published the defamatory statement alleged above. Ms. Caldwell's departure from these standards, and from generally accepted standards of journalism evidence actual malice. Plaintiff is informed and believes that neither Ms. Caldwell nor NBCUniversal ever corrected or retracted the claim that Mr. Blankenship was a "convicted felon."

56.    On June 25, 2018, Defendant CNBC published an article by Brian Schwartz stating: "He also campaigned with Morrisey in early June when he was competing in a crowded primary that included coal baron and convicted felon Don Blankenship who is now running as a third party candidate." Mr. Blankenship's conviction was a matter of public record which was readily available to Mr. Schwartz. Mr. Schwartz is a sophisticated and knowledgeable political journalist with extensive experience and involvement in politics. Plaintiff is informed and believes that CNBC has adopted and enforces ethical and other standards which govern its reporting and publication of information and in particular information about a person's criminal history. Plaintiff is further informed and believes that these standards were applicable to Mr. Schwartz at the time he published the defamatory statement alleged above. Mr. Schwartz's departure from these standards, and from generally accepted standards of journalism evidence actual malice.

## COUNT I

## DEFAMATION – ALL DEFENDANTS

57.     Plaintiff reincorporates and re-alleges paragraphs 1 through 56 above as though set forth fully herein.

58.     Defendants, and each of them, made statements of fact as set forth above, which were materially false, namely that Mr. Blankenship was a felon, and/or that Mr. Blankenship had been convicted of a felony.   To the extent any of Defendants' above-described statements were statements of opinion (and they were not), each such purported opinion implied the existence of undisclosed defamatory facts as the basis for the opinion, in that such opinions would appear to a reasonable person to be based on the untrue and defamatory facts that Mr. Blankenship was a felon and/or had been convicted of a felony and/or went to jail for manslaughter.

59.     Defendants, and each of them, caused to be published the above-described defamatory statements about Mr. Blankenship.

60.     Defendants' statements were defamatory in that they reflected shame, contumely, and disgrace upon Mr. Blankenship by stating that he was a felon and/or had been convicted of a felony and/or had gone to jail for manslaughter.

61.     Defendants' statements were defamatory *per se* in that they were and are incapable of an innocent meaning and charged Mr. Blankenship with the commission of crimes of which he was acquitted, and were imputations as affecting his business, trade, profession, and/or office.

62.     Defendants' statements with respect to the Mr. Blankenship were materially and entirely false in that Mr. Blankenship is not a felon and has never been convicted of a felony, neither manslaughter nor any other felony, and in fact was acquitted of all felony charges with which he had ever been charged.

63.     Defendants, and each of them, made their respective defamatory statements with actual malice, that is, actual knowledge of the falsity of their

263663

statements or, at a minimum, with reckless and willful disregard of the truth or falsity of the statements. Among other reasons and without limitation, Defendants' wrongful conduct was motivated by the matters discussed herein above.

64. Anyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals by the Defendant media organizations themselves), would know that Mr. Blankenship was acquitted of all felony charges, that Mr. Blankenship was convicted only of a misdemeanor, and that Mr. Blankenship has never been convicted of a felony, whether for manslaughter or any other reason.

65. In addition, Mr. Blankenship is further informed and believes, and based thereon alleges, that the Defendants, and each of them, failed to follow or comply with their own policies and procedures regarding the reporting of criminal convictions.

66. Defendants, and each of them, intended to cause injury to Mr. Blankenship by publishing their false defamatory statements.

67. Mr. Blankenship was damaged by Defendants' defamatory statements in an amount to be proven at trial, but which exceeds the jurisdictional minimum of this Court.

## COUNT II

## FALSE LIGHT INVASION OF PRIVACY – ALL DEFENDANTS

68. Plaintiff reincorporates and re-alleges paragraphs 1 through 67 above as though set forth fully herein.

69. Defendants, and each of them, published matter which placed Mr. Blankenship in a false light before the public, as set forth above, namely that Mr. Blankenship was a felon, and/or that Mr. Blankenship had been convicted of a felony.

70. Defendants' publications, and the message conveyed thereby to the public that Mr. Blankenship was a felon, and/or that Mr. Blankenship had been

COMPLAINT

convicted of a felony, were untrue and of a nature highly offensive to a reasonable person.

71.     Defendants' publications, and each of them, were widely disseminated throughout West Virginia and in many cases, throughout the country.

72.     Defendants, and each of them, made their respective publications with actual malice, that is, actual knowledge of the falsity of the publications, or at a minimum, with reckless and willful disregard of the truth or falsity of the publications.  Among other reasons and without limitation, Defendants' wrongful conduct was motivated by the matters discussed herein above.

73.     Anyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals by the Defendant media organizations themselves), would know that Mr. Blankenship was acquitted of all felony charges, that Mr. Blankenship was convicted only of a misdemeanor, and that Mr. Blankenship has never been convicted of a felony, whether for manslaughter or any other reason.

74.     In addition, Mr. Blankenship is further informed and believes, and based thereon alleges, that Defendants, and each of them, failed to follow or comply with their own policies and procedures regarding the reporting of criminal convictions.

75.     Mr. Blankenship was damaged by Defendants' statements placing him in a false light before the public in an amount to be proven at trial, but which exceeds the jurisdictional minimum of this Court.

## DEMAND

Plaintiff demands judgment against all Defendants for the following damages and other relief:

### AS TO COUNT ONE

1.     Judgment for general damages for defamation;

263663

2.      Judgment for special damages for defamation;

3.      A permanent injunction against Defendants, and each of them, prohibiting republication of the defamatory statements and requiring the removal of the defamatory statements from public access;

**AS TO COUNT TWO**

4.      Judgment for general damages for false light invasion of privacy;

5.      Judgment for special damages for false light invasion of privacy;

6.      A permanent injunction against Defendants, and each of them, prohibiting republication of the statements placing Plaintiff in a false light before the public and requiring the removal of those statements from public access;

**AS TO ALL COUNTS**

7.      Judgment for punitive damages

8.      Judgment for emotional distress damages;

9.      Such statutory judgment interest as may be appropriate; and

10.     Such further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

**\*PLAINTIFF DEMANDS A JURY TRIAL**

DON BLANKENSHIP
By Counsel

*/s/ Jeffrey S. Simpkins*

Jeffrey S. Simpkins, Esq.
WVSB #9806

*SIMPKINS LAW*
102 E. 2nd Ave.
Williamson, WV 25661
304.235.2735
simpkinslawoffice@gmail.com

Eric P. Early, Esq.
(CA State Bar No. 166275, *pro hac vice* forthcoming)
Jeremy Gray, Esq.
(CA State Bar No. 150075, *pro hac vice* forthcoming)
Kevin S. Sinclair, Esq.
(CA State Bar No. 254069, NV State Bar No. 12277, *pro hac vice* forthcoming) *EARLY SULLIVAN WRIGHT GIZER & McRAE LLP*
6420 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048
323.301.4660
eearly@earlysullivan.com
jgray@earlysullivan.com
ksinclair@earlysullivan.com

263663